# IN THE SUPREME COURT OF IOWA

No. 18 / 04-0058

Filed August 25, 2006

**STATE OF IOWA**,

     Appellee,

vs.

**RODNEY NEIL HEEMSTRA**,

     Appellant.

_____

Appeal from the Iowa District Court for Warren County, William H. Joy, Judge.

Defendant appeals from conviction of first-degree murder under Iowa Code sections 707.1 and 707.2 (2001). **REVERSED AND REMANDED.**

Paul Rosenberg of Paul Rosenberg & Associates, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Darrel L. Mullins and Douglas D. Hammerand, Assistant Attorneys General, and Gary Kendell, County Attorney, for appellee.

**LARSON, Justice.**

Rodney Heemstra was convicted by a jury of first-degree murder under Iowa Code sections 707.1 and 707.2 (2001). He appealed, challenging the district court's instructions to the jury, its refusal to order production of medical records, and its denial of his motion for new trial. We reverse and remand.

## I. *Facts and Prior Proceedings.*

Rodney Heemstra and Tom Lyon were farmers in Warren County, Iowa. Since 1998 Lyon had rented a portion of land belonging to a Rodgers family. In July 2002 Heemstra purchased the land with a closing date set for March 10, 2003. As the renter in possession, Lyon was legally entitled to remain on the Rodgers farm until March 1, 2003. After Heemstra purchased the land, relations between Lyon and Heemstra became strained over who would have possession of it pending transfer of title. Lyon had hoped to purchase the farm, and he was upset that Heemstra bought it. Heemstra testified to incidents in which Lyon would swear at him and make threats. He also presented evidence of Lyon's temper, including a scuffle between Lyon and another person and heated statements by Lyon regarding the sale of the farm. On one occasion, Lyon was upset that waterers used by his cows on the land had been switched off, presumably by Heemstra. One time, Lyon asked a deputy sheriff, "what happens if I beat the little son-of-a-bitch up?" One witness testified that he heard Lyon say to himself that he ought to shoot some unidentified person. Another witness testified that he had been assaulted by Lyon in 1998 over a grain bin disagreement. Other witnesses had a different view of Lyon, testifying that they did not consider him to be a violent person.

On January 13, 2003, Heemstra and Lyon, both driving pickups, were traveling in the same direction on a county road near Lyon's home.

According to Heemstra, he was driving behind Lyon, who stopped his truck and angled it to block the road. Both men left their trucks. Heemstra testified that Lyon was hostile, contorted with rage, saying he was going to make "goddamn sure that I did not end up with that farm." Heemstra, feeling threatened, retrieved a rifle from his truck "to neutralize [the] situation," according to him. Heemstra testified that, as he was getting the gun, Lyon shouted obscenities at him, saying "[I didn't] have the balls to pull the trigger, and he lunged at me, and I shot him." Lyon's body was later recovered in a cistern located on land farmed by Heemstra about a quarter of a mile from Lyon's abandoned truck. Lyon had sustained a single gunshot to the head, as well as other injuries resulting from being dragged behind Heemstra's truck to the cistern. The medical examiner could not determine whether these injuries occurred before or after Lyon died.

The following day, officers went to Heemstra's home. They had heard that Lyon and Heemstra had been having problems and that a truck similar to Heemstra's was seen in the area where Lyon's truck was found. When questioned, Heemstra initially denied knowledge of any harm to Lyon and said he had not seen him for several days. Heemstra consented to the officers searching his truck, where they found what they thought were blood and hair. Heemstra then admitted he had been present at Lyon's death and finally confessed to shooting him. When he was asked by the officers whether Lyon had anything in his hands, Heemstra said, "no, I shot a defenseless man." Heemstra took officers to a field where he had thrown the murder weapon, and after recovery of the weapon, he was arrested.

At trial, Heemstra claimed self-defense. He introduced evidence that Lyon had talked about harming or killing Heemstra and that Lyon could be a violent person. Evidence was also presented that suggested Lyon may

have had mental health problems. In the year before his death, he had consulted with Dr. Barbara Ohnemus and Dr. Sandra Duncan concerning his anxiety and depression. Heemstra's attorney attempted to obtain records of these consultations, hoping to bolster his self-defense theory, but was unsuccessful.

## II. *The Issues.*

On Heemstra's appeal, he complains that the trial court erred in (1) instructing the jury on felony murder, (2) quashing his request to obtain the victim's medical records, and (3) denying his motion for new trial based on alleged jury misconduct. He also alleges ineffective assistance of counsel by failing to file a motion to suppress Heemstra's statement to officers and failing to make a timely request for Lyon's medical records.

## III. *The Statutes.*

Under Iowa Code section 707.2:

> A person commits murder in the first degree when the person commits murder under any of the following circumstances:
>
>   1. The person willfully, deliberately, and with premeditation kills another person.
>   2. The person kills another person while participating in a forcible felony.

A "forcible felony" is defined by section 702.11 as "any felonious child endangerment, assault, murder, sexual abuse, kidnapping, robbery, arson in the first degree, or burglary in the first degree." The combination of sections 707.2(2) and 702.11 constitute what is commonly known as the "felony murder" rule.

## IV. *The Court's Instructions.*

The district court instructed on both alternatives for first-degree murder: willful, deliberate, and premeditated murder under section

707.2(1) and felony murder under section 707.2(2). The marshaling instruction on first-degree murder advised the jury:

> The State must prove all of the following elements of Murder in the First Degree:
>
> 1. On or about the 13th day of January, 2003, the defendant shot Tommy Ray Lyon.
>
> 2. Tommy Ray Lyon died as a result of being shot.
>
> 3. The defendant acted with malice aforethought.
>
> 4. Either
>
> > a. *The defendant was participating in Willful Injury as defined in Instruction No. 26 [felony murder], or*
> >
> > b. *The defendant acted willfully, deliberately, premeditatedly, and with specific intent to kill Tommy Ray Lyon.*
>
> 5. The defendant was not justified.

(Emphasis added.)

"Willful injury," as referred to in the felony-murder instruction, is defined by Iowa Code section 708.4:

> Any person who does an act which is not justified and which is intended to cause serious injury to another commits the following:
>
> 1. A class "C" felony, if the person causes serious injury to another.
>
> 2. A class "D" felony, if the person causes bodily injury to another.

The court's explanation of willful injury, found in Instruction No. 26, stated:

> The offense of Willful Injury contains the following four elements:
>
> 1. On or about the 13th day of January, 2003, the defendant *intentionally pointed a firearm at Tommy Ray Lyon or displayed a dangerous weapon in a threatening manner.*
>
> 2. The defendant specifically intended to cause a serious injury to Tommy Ray Lyon.

      3. Tommy Ray Lyon sustained a serious injury.

      4. The defendant did not act with justification.

(Emphasis added.)

The State argues that the pointing of the gun or displaying it in a dangerous manner constituted willful injury. There is no dispute that Heemstra pointed the gun at Lyon and did so intentionally; he admits that. He argues, however, that the act of "point[ing] a firearm . . . or display[ing] a dangerous weapon in a threatening manner" does not fit the statutory definition of willful injury and cannot provide the basis for felony murder. In fact, Instruction No. 26 does not describe a felony at all, according to him, but an aggravated misdemeanor under Iowa Code section 708.1(3) (A person commits misdemeanor assault when he "[i]ntentionally points any firearm toward another, or displays in a threatening manner any dangerous weapon toward another.").

## V. *The Defendant's Challenge to the Instructions.*

A. *Standard of review.* We review challenges to jury instructions for correction of errors at law. *State v. Breitbach*, 488 N.W.2d 444, 449 (Iowa 1992). To the extent that error is based on constitutional grounds, our review is de novo. *State v. Ortiz*, 618 N.W.2d 556, 558-59 (Iowa 2000).

B. *Preservation of error.* On appeal Heemstra claims that, if the jury found he had committed willful injury, it would be permitted to find first-degree murder under the felony-murder instruction without finding the elements of deliberation, premeditation, and specific intent to kill. He further argues that, while forcible felonies may infer such elements under the felony-murder rule, that was not the case here because the act specified in the court's felony-murder instruction was not a forcible felony, as defined by section 702.11.

The State counters that Heemstra failed to preserve error on his argument that pointing a gun at a person cannot be considered willful injury under the felony-murder instruction. Heemstra's trial counsel objected to the instruction by stating:

> By submitting willful injury as the predicate felony, it plainly permits the jury to find the defendant guilty of murder in the first degree without proof of deliberation, premeditation and specific intent to kill, and additionally, by permitting the jury to infer malice from the commission of the offense of willful injury permits the jury to find the defendant guilty of first-degree murder without proof of malice.

We believe this objection was sufficient to alert the court to the problem inherent in the felony-murder instruction, i.e., if the jury found Heemstra pointed the gun at Lyon intending to cause serious injury and that serious injury resulted, it could find felony murder, despite the fact that the gun pointing was not a forcible felony for purposes of felony murder and without proof of willfulness, deliberation, and premeditation.

The State argues that, even if the willful injury under Instruction No. 26 "embrace[d] both misdemeanor and felonious assault, the error is harmless. Heemstra has always acknowledged he shot Lyon." We disagree with the conclusion that any confusion was harmless. While Heemstra admits he shot Lyon, he does not admit he shot him willfully, deliberately, and with premeditation as required to constitute first-degree murder under section 707.2(1). Further, Heemstra does not admit he shot Lyon while participating in a forcible felony under section 707.2(2) for felony-murder purposes.

C. *Comparison of murder alternatives.* First-degree murder under Iowa Code section 707.2(1) requires proof that the murder was committed "willfully, deliberately, and with premeditation." In contrast, first-degree murder based on the felony-murder rule under section 707.2(2) does not

require proof of any of these elements; they are presumed to exist if the State proves participation in the underlying forcible felony. *See State v. Williams*, 285 N.W.2d 248, 270 (Iowa 1979) ("[A] showing that the murder occurred in the perpetration of a felony is merely a particular statutorily prescribed method for showing the mental elements of deliberation and premeditation.").

The rationale of the felony-murder rule is that certain crimes are so inherently dangerous that proof of participating in these crimes may obviate the need for showing all of the elements normally required for first-degree murder. This reduced quantum of proof in establishing first-degree murder has caused the felony-murder doctrine to be called "[o]ne of the most controversial doctrines in the field of criminal law . . . ." Erwin S. Barbre, Annotation, *What Felonies Are Inherently or Foreseeably Dangerous to Human Life for Purposes of Felony-Murder Doctrine*, 50 A.L.R.3d 397, 399 (1973). The California Supreme Court has observed that:

> The felony-murder rule has been criticized on the grounds that in almost all cases in which it is applied it is unnecessary and that it erodes the relation between criminal liability and moral culpability. Although it is the law in this state, it should not be extended beyond any rational function that it is designed to serve.

*People v. Washington*, 402 P.2d 130, 134 (Cal. 1965) (citations omitted). Because violence is the *sine qua non* of felony murder under Iowa's statute, as well as at common law, the felony-murder statute limits itself to felonies involving violence.

Even if the acts of the defendant were considered to be willful injury, as the State argues, the question remains whether willful injury may be considered a predicate for felony murder under the facts of this case. A long line of Iowa cases have answered that question in the affirmative, but we believe we must revisit the issue and reach a contrary conclusion.

Beginning with *State v. Beeman*, 315 N.W.2d 770 (Iowa 1982), we have held that willful injury could serve as the predicate felony for felony murder because willful injury is, by statute, a "forcible felony." *Id.* at 776-77. We discussed that theory further in *State v. Ragland*, 420 N.W.2d 791, 793 (Iowa 1988):

> Murder is committed when "a person kills another person with malice aforethought." Iowa Code § 707.1. A murder becomes first-degree murder when it is committed under any of four sets of circumstances. *Id.* § 707.2. Pertinent to this case, a murder is in the first degree when committed "while participating in a forcible felony." *Id.* § 707.2(2). There is no suggestion in our statutes that "forcible felony" was not intended to include the crime of willful injury.

One writer, critical of the *Beeman* line of cases, has observed:

> The result of [Beeman] continued since the court's decision in 1982 with mixed reviews. The use of willful injury as a basis for a felony murder charge relieves the State of its obligation to prove the murder was premeditated, deliberated, and specific intent was formed to kill. However, the other felonies must be committed independently. A murder in the first degree under the theory of premeditation, deliberation, and specific intent to kill cannot be committed without also committing the offense of willful injury. Because malice may be permissibly inferred from the underlying felony . . . conviction of murder in the first degree becomes a virtual certainty. Other jurisdictions have not followed the approach adopted by the Iowa Supreme Court in Beeman.
>
> . . . .
>
> The legislature can, unintentionally, expand the felony murder doctrine by creating new criminal statutes that are felonious assaults. An example is a recent amendment to the assault chapter of the Iowa Code [(Iowa Code section 702.11(2), which provided that less serious, class "D," versions of willful injury would not be considered as forcible felonies)].
>
> Had the legislature not classified the amendment as a non-forcible felony and the courts applied the Beeman analysis, an assault resulting in a death would be classified murder in the first degree. Death is obviously a bodily injury. Premeditation, deliberation and specific intent to kill are not elements. Since assault is a general intent crime, no specific intent demonstrating an evil purpose is required. Coupled with an instruction that malice may be inferred from the commission of an assault, the application of Beeman creates

an ever expanding felony murder rule. It is doubtful the legislature ever intended such a result, and one must question the court's reasoning in Beeman.

4 Robert R. Rigg, *Iowa Practice Criminal Law (I)* § 3:16, at ___ (2006) (footnotes omitted).

A law review note poses several scenarios that, in the absence of sound prosecutorial discretion, could test the outer constitutional parameters of our felony-murder law under the *Beeman* line of cases:

> A woman strikes her friend intending to cause serious injury, but death results instead. A father leaves his young child alone at home knowing that the child may be at risk, and the child accidentally dies. Can the criminal justice system treat these crimes the same as willful, deliberate, and premeditated murders? In Iowa, the answer may be yes. These individuals could be guilty of first degree felony murder and face life imprisonment without possibility of parole.

Kristy L. Albrecht, *Iowa's Felony-Murder Statute: Eroding Malice and Rejecting the Merger Doctrine*, 79 Iowa L. Rev. 941, 941 (1994) (footnotes omitted).[1]

Ordinarily in felony murder based on assault, the assault causing death is considered to be merged into the murder and cannot be used as an independent felony for felony-murder purposes. As stated by the Massachusetts Supreme Court,

> in felony-murder the conduct which constitutes the felony must be "separate from the acts of personal violence which constitute a necessary part of the homicide itself. Thus, although rape, arson, robbery and burglary are sufficiently independent of the homicide, . . . aggravated battery toward the deceased will not do for felony murder . . . ."

*Commw. v. Quigley*, 462 N.E.2d 92, 95 (Mass. 1984) (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 71, at 559 (1972)).

---

[1]These results are possible because the woman's striking of her friend could constitute willful injury under Iowa Code section 708.4, and the negligent father could be found guilty of child endangerment under Iowa Code section 726.6. Both crimes could qualify as forcible felonies under section 702.11 and, therefore, serve as predicate offenses for felony-murder purposes.

This principle is illustrated by an interesting Massachusetts case, *Commonwealth v. Kilburn*, 780 N.E.2d 1237 (Mass. 2003). In that case, the defendant committed two assaults with a weapon: the first was committed by brandishing the gun in the face of the victim and, at a later time, by actually shooting and killing the victim. The court held the second assault, the one that caused the victim's death, could not be considered a predicate felony because it was merged into the murder itself. The first assault did constitute a basis for felony murder. The rationale was that,

> [a]bsent this requirement, the assault that precedes every killing would serve as the predicate for felony-murder in the first degree, and the distinction between degrees of murder would be lost.

*Kilburn*, 780 N.E.2d at 1240.

The court in *Kilburn* said:

> While the act of shooting [the victim] clearly caused the homicide in this case, the gunman's brandishing of a pistol with the intention of arousing fear in [the victim] did not. [The victim] died of a gunshot wound; he did not die of fright. Applying the causation test for merger . . ., we conclude that, while the second of the two assaults on [the victim] merged with the murder, the first did not.

*Id.* at 1241. Similarly, in *Commonwealth v. Gunter*, 692 N.E.2d 515 (Mass. 1998), assaults by the defendant against other occupants of an apartment were independent felonies that could support felony murder, but the assault against the occupant who was killed could not because it was not an independent felony. *Gunter*, 692 N.E.2d at 526.

The California Supreme Court reversed a felony-murder conviction under facts similar to the present case in *People v. Ireland*, 450 P.2d 580 (Cal. 1969). In that case, the State attempted to use the act causing the death to establish the predicate felony. The court stated:

> We have concluded that the utilization of the felony-murder rule in circumstances such as those before us extends

the operation of that rule "beyond any rational function that it is designed to serve." To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law.

*Ireland*, 450 P.2d at 590 (quoting *People v. Washington*, 402 P.2d 130, 134 (Cal. 1965)). According to the Oregon court,

[i]n order to preserve the distinctions between the degrees of murder and manslaughter, courts in other states have held that where the only felony committed (apart from the murder itself) was the assault upon the victim which resulted in the death of the victim, the assault merged with the killing and could not be relied upon by the state as an ingredient of a "felony murder."

*State v. Branch*, 415 P.2d 766, 767 (Or. 1966).

### VI. *Analysis of the Iowa Rule.*

We explained the rationale for our view of willful injury in felony-murder cases in *Beeman*:

Section 707.1, The Code, provides: "A person who kills another person with malice aforethought either express or implied commits murder." Section 707.2(2) provides: "A person commits murder in the first degree when he or she commits murder under any of the following circumstances: . . . The person kills another person while participating in a forcible felony." "Forcible felony" is defined as "any felonious assault, murder, sexual abuse, kidnapping, robbery, arson in the first degree, or burglary in the first degree." § 702.11. Willful injury is a felonious assault, section 708.4, and thus, like sexual abuse, may serve as the underlying felony in a felony-murder instruction.

315 N.W.2d at 775. Briefly stated, felony murder may be based on the commission of a forcible felony under Iowa Code section 707.2(2), and willful injury is a forcible felony under Iowa Code section 702.11, as it constitutes a "felonious assault" under Iowa Code section 708.4. Because a forcible felony may be the basis of murder under section 707.2(2), the *Beeman* court reasoned that willful injury qualifies as a predicate offense.

On further reflection, we adhere to the view that willful injury is a forcible felony under Iowa Code section 702.11 and, in *some circumstances*, may serve as a predicate for felony-murder purposes. For example, if the defendant assaulted the victim twice, first without killing him and second with fatal results, the former could be considered as a predicate felony, but the second could not because it would be merged with the murder. *See Kilburn*, 780 N.E.2d at 1243. Otherwise, all assaults that immediately precede a killing would bootstrap the killing into first-degree murder, and all distinctions between first-degree and second-degree murder would be eliminated.

It is argued in this case that,

> [a]lthough the reasoning of those courts and commentators that reject the use of felonious assaults as crimes for which felony murder may be established is based on sound policy considerations, those considerations have been rejected by [the Iowa] legislature. As a result, this court is not free to invoke those considerations no matter how valid we find them to be.

This is simply not true. The legislature has never considered the issue of whether, when the act causing willful injury is the same as that causing death, the two acts should be deemed merged.

In a similar case from New York, *People v. Moran*, 158 N.E. 35 (1927), the defendant was charged with felony murder based on his felonious assault on the victim. The court, writing through Chief Judge Cardozo, described the New York statute:

> Homicide is murder in the first degree when perpetrated with a deliberate and premeditated design to kill, or, without such design, while engaged in the commission of a felony.

*Moran*, 158 N.E. at 36. In *Moran* the defendant had been convicted on the basis that he had committed a felonious assault; however, the court reversed, stating:

> [I]t is not enough to show that the homicide was felonious, or that there was a felonious assault which culminated in homicide. Such a holding would mean that every homicide, not justifiable or excusable, would occur in the commission of a felony, with the result that intent to kill and deliberation and premeditation would never be essential. The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., robbery or larceny or burglary or rape.

*Id.*

Although the State argues that merger principles should not apply to these facts, nothing in any of the statutes relied upon to support that argument suggests that the legislature had any intent to abolish the principle of merger under the circumstances of this case. Furthermore, we should not defer to the legislature for a signal for us to adopt a legal principle that is the responsibility of the court and within the power of the court to apply, based on legal precedent, common sense, and fairness.

We now hold that, if the act causing willful injury is the same act that causes the victim's death, the former is merged into the murder and therefore cannot serve as the predicate felony for felony-murder purposes. In reaching this conclusion, we agree that we should not attribute to the legislature an intent to "create[] an ever-expanding felony murder rule" by characterizing every willful injury as a forcible felony for felony-murder purposes. *See* Rigg § 3:16, at ___. We realize that this view is inconsistent with our prior cases, including *Beeman* and its progeny. We therefore overrule those cases, insofar as they hold that the act constituting willful injury and also causing the victim's death may serve as a predicate felony for felony-murder purposes. Those cases include *Beeman*, 315 N.W.2d at 777. We also overrule the cases that followed it: *State v. Anderson*, 517 N.W.2d 208, 214 (Iowa 1994); *State v. Rhomberg*, 516 N.W.2d 803, 805 (Iowa 1994); *Ragland*, 420 N.W.2d at 793; and *State v. Mayberry*, 411 N.W.2d 677, 682-83 (Iowa 1987).

The rule of law announced in this case regarding the use of willful injury as a predicate felony for felony-murder purposes shall be applicable only to the present case and those cases not finally resolved on direct appeal in which the issue has been raised in the district court.

## VII. *The Prejudice Issue.*

When a general verdict does not reveal the basis for a guilty verdict, reversal is required. *State v. Martens*, 569 N.W.2d 482, 485 (Iowa 1997) ("[T]he validity of a verdict based on facts legally supporting one theory for conviction of a defendant does not negate the possibility of a wrongful conviction of a defendant under a theory containing legal error."); *State v. Hogrefe*, 557 N.W.2d 871, 881 (Iowa 1996) ("With a general verdict of guilty, we have no way of determining which theory the jury accepted.").

Because we have no indication as to which basis of guilt the jury accepted, we must reverse and remand for a new trial.

## VIII. *The Medical Privilege Issue.*

On retrial an additional issue is certain to be raised—whether the defense is entitled to obtain the medical records of the deceased victim. Prior to trial, Heemstra obtained a *subpoena duces tecum* for Lyon's medical records to bolster his self-defense claim based on possible threats by the victim. Dr. Duncan and the victim's estate moved to quash the subpoenas, and Heemstra resisted. These records were provided to the court in response to the subpoena. The court did not reveal the records to the defendant or the State, but it did review them *in camera* for two limited purposes: (1) to determine if any direct threats were made by the victim regarding Heemstra and (2) to determine if statements made by the victim revealed the existence of potential witnesses who may shed light on Lyon's relationship with Heemstra. After the court reviewed the records, it found they contained no evidence concerning the two areas that the court had

identified. The defendant's attorney asked the court to expand the scope of its *in camera* review, stating:

> I think that the defendant's due process rights and his Sixth Amendment rights to confront his accusers and to compel the production of information that would be relevant and helpful to his defense, is broader than those two areas and we can, of course, only trust the court to be sensitive to those due process and Sixth Amendment rights to compulsory process and to confront his accusers.

The court denied Heemstra's request for disclosure and ordered the records to be sealed.

Iowa Code section 622.10(1) provides:

> A practicing attorney, counselor, physician, surgeon, . . . mental health professional, . . . who obtains information by reason of the person's employment, or a member of the clergy shall not be allowed, in giving testimony, to disclose any confidential communication properly entrusted to the person in the person's professional capacity, and necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline.

A statute dealing specifically with mental health professionals, including psychologists, provides:

> Except as specifically authorized in [provisions not applicable here], a mental health professional, data collector, or employee or agent of a mental health professional, of a data collector, or of or for a mental health facility shall not disclose or permit the disclosure of mental health information.

Iowa Code § 228.2(1). This section is broader than the general privilege statute, Iowa Code § 622.10, because it is not limited to "testimony" by the psychologist.

Heemstra contends that Lyon's medical records will show that Lyon had character traits of "unmanageable anger, aggression and violence and that he sought and received medical treatment for those problems within months of his death." He argues that he should be entitled to receive these records on three grounds: (1) the records are essential to his ability to

receive effective assistance of counsel and due process, (2) the statutory provisions of Iowa Code sections 228.2 and 622.10 do not expressly prohibit their disclosure, and (3) the disclosure of the medical records by the victim's estate in its wrongful death suit against Heemstra constitutes a waiver of any claim of confidentiality. We first address the waiver issue.

### IX. *The Waiver Issue.*

Heemstra argues that, even if the evidence he seeks is protected by the psychotherapist-patient privilege, the privilege was waived by the victim's estate by filing a wrongful-death claim against Heemstra. In the civil case, Tom Lyon's medical records were furnished to Heemstra's civil attorney under a protective order that prohibited the attorney from furnishing the records to Heemstra or Heemstra's criminal defense lawyer.

In this appeal, Heemstra argues that the Lyon estate's authorization for release of the psychotherapists' records "constitutes at least a partial waiver of any claim of confidentiality" in the criminal case. We reject this argument. We believe a right as valuable as a psychotherapist privilege should not be deemed to be waived by implication except under the clearest of circumstances. In any event, waiver in one proceeding is not a valid waiver in another, even if we were to accept Heemstra's invitation to take judicial notice of the civil file. *See United States v. Goodman*, 289 F.2d 256, 259 (4th Cir.), *vacated and remanded on other grounds*, 368 U.S. 14, 82 S. Ct. 127, 7 L. Ed. 2d 75 (1961); 8 *Wigmore on Evidence* § 2276, at 470-72 (McNaughton rev. 1961). We conclude that Lyon's estate did not waive the psychotherapist-patient privilege for purposes of the present case.

### X. *Scope of the Privilege.*

The wording of section 622.10 appears to limit the privilege to testimony. *See In re Marriage of Hutchinson*, 588 N.W.2d 442, 446 (Iowa 1999).

> [T]he section 622.10 privilege includes declarations by a witness in court or in a deposition.  On the other hand, the privilege does not prohibit a physician in a nontestimonial setting from disclosing any confidential communications.  Only the physician's ethical obligation prohibits the physician from making the disclosure without the patient's consent.

*Id.* (citations omitted); *see also McMaster v. Iowa Bd. of Psychology Exam'rs*, 509 N.W.2d 754, 757 (Iowa 1993) (privilege limited to disclosure of communications by giving testimony); *Roosevelt Hotel Ltd. P'ship v. Sweeney*, 394 N.W.2d 353, 355 (Iowa 1986) ("Section 622.10 applies only to the testimonial use of privileged information . . . because it comes into play 'in giving testimony.' "); *Chidester v. Needles*, 353 N.W.2d 849, 852 (Iowa 1984) (subpoena does not require disclosure of privileged communications because it does not involve the giving of testimony).  However, recent cases show a more expansive view of the medical privilege under section 622.10.  For example, we have held that "[t]he privilege extends to medical records that contain information which would be inadmissible at trial as oral testimony from the physician." *State v. Eldrenkamp*, 541 N.W.2d 877, 881 (Iowa 1995); *see also State v. Demaray*, 704 N.W.2d 60, 64-65 (Iowa 2005) (stating that medical records containing the results of Demaray's blood test were covered by the physician/patient privilege).  This more liberal interpretation of section 622.10 is logical because the privilege would be virtually meaningless if it prohibited testimony but did not protect the very records upon which such testimony would be based.

Our procedural rules and cases applying section 622.10 have shown great solicitude for the physician-patient privilege.  Under rule of civil procedure 1.503(1), privileged information is generally not even discoverable.  In addition, we have said that the

> physician-patient privilege is intended to promote free and full communication between a patient and his doctor so that the doctor will have the information necessary to competently diagnose and treat the patient.

*State v. Deases*, 518 N.W.2d 784, 787 (Iowa 1994), and that we "construe the statute liberally to carry out its manifest purpose." *Eldrenkamp*, 541 N.W.2d at 881.

Sound public policy supports a more protective treatment for mental health records than those in other doctor-patient situations. As the seventh circuit has observed, concerning recognition of a psychotherapist-patient privilege,

> [r]eason tells us that psychotherapists and patients share a unique relationship, in which the patient's ability to communicate freely without the fear of public disclosure is the key to successful treatment. . . .

> Moreover, communications with a psychotherapist often involve highly personal matters, the disclosure of which "would frequently be embarrassing to the point of mortification for the patient." Indeed, courts and commentators have focused on an individual's right of privacy, "a fundamental tenet of the American legal tradition," to justify the psychotherapist/patient privilege.

*Jaffee v. Redmond*, 51 F.3d 1346, 1355-56 (7th Cir. 1995) (quoting *In re Doe*, 964 F.2d 1325, 1328 (2d Cir. 1992)), *cert. granted*, 516 U.S. 930, 116 S. Ct. 334, 133 L. Ed. 2d 234 (1995); *accord Chung v. Legacy Corp.*, 548 N.W.2d 147, 149 (Iowa 1996) (suggesting certain patient-physician communications may fall within a protected zone of privacy).

Heemstra argues that he needs the records, not for the purpose of admitting them as evidence, but to further investigate Lyon's propensity toward violence. He claims his constitutional right to confront witnesses, compulsory process, and right to present a defense were all impaired by the court's denial of access to Lyon's medical records. He argues that we should adopt a "balancing" test under which a court weighs the patient's need for privacy and confidentiality against the defendant's need for the information to effectively defend his case.

In a civil case regarding the psychotherapist-patient privilege, the United States Supreme Court, in *Jaffee v. Redmond*, 518 U.S. 1, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996), recognized the existence of the psychotherapist privilege, but rejected the argument that a "balancing" test should be used.

> We part company with the Court of Appeals on a separate point. We reject the balancing component of the privilege implemented by that court and a small number of States. Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in *Upjohn* [*Co. v. United States*, 449 U.S. 383, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)], if the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." 449 U.S. at 393, 101 S. Ct. at 684[, 66 L. Ed. 2d at 593].

*Id.* at 17-18, 116 S. Ct. at 1932, 135 L. Ed. 2d at 349-50 (footnote omitted).

While advocating the importance of the psychotherapist privilege, the Court also acknowledged that it was not absolute, leaving open the possibility that subsequent courts may adopt exceptions. It stated:

> Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.

*Id.* at 18 n.19, 116 S. Ct. at 1932 n.19, 135 L. Ed. 2d at 349-50 n.19.

Courts in some criminal cases have recognized that, despite their solicitude for various testimonial privileges, these privileges must be tempered by defendants' constitutional right to present a defense. The defendant points to *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39

L. Ed. 2d 347 (1974), in urging this court to engage in a balancing test. *Davis* involved an Alaska statute that provided for confidentiality of a juvenile's offense record. The Supreme Court held that the rights of a criminal defendant who sought to introduce a juvenile witness's record could override the statutory confidentiality in order to effectively cross-examine the juvenile. The Court stated that:

> We do not and need not challenge the State's interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender. . . . Serious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry. In this setting we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender. Whatever temporary embarrassment might result to [the witness] or his family by disclosure of his juvenile record . . . is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness.
>
> . . . [W]e conclude that the State's desire that [the witness] fulfill his public duty to testify free from embarrassment and with his reputation unblemished must fall before the right of petitioner to seek out the truth in the process of defending himself.
>
> The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness.

*Davis*, 415 U.S. at 319-20, 94 S. Ct. at 1112, 39 L. Ed. 2d at 355-56 (citation omitted).

In *United States v. Hansen*, 955 F. Supp. 1225 (D. Mont. 1997), the defense subpoenaed a psychiatrist's treatment records of a deceased victim. That court noted the public's interest in a psychotherapist-patient privilege and weighed it against the defendant's constitutional right to a fair trial. Without detailed discussion, the court simply stated, "I find that the defendant's need for the privileged material outweighs this interest." In reaching this conclusion, the court noted that the patient was deceased.

*Hansen*, 955 F. Supp. at 1226. Also, in *United States v. Alperin*, 128 F. Supp. 2d 1251 (N.D. Cal. 2001), a federal magistrate rejected the victim's argument that the psychotherapist-patient privilege barred production of the records. The court found that the victim's mental health could be material to the defendant's self-defense claim and that this evidentiary benefit outweighed the victim's "strong interest in keeping her communications with her psychiatrist confidential." *Alperin*, 128 F. Supp. 2d at 1255.

Although Iowa's privilege statutes generally prevent disclosure of medical records, a court

> can . . . require the disclosure of information that would otherwise be privileged. For example, it has long been recognized that the criminal defendant's Sixth Amendment right to confront the witnesses against him means that the government cannot simultaneously prosecute an individual and assert privileges that would inhibit his defense.

23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5436, at 887 (1980) (footnotes omitted).

In *McMaster* we recognized a right to privacy in medical records, but suggested the use of a balancing test to determine whether a "compelling need" existed to obtain the evidence. We said:

> "The privacy interest must always be weighed against such public interests as the societal need for information, and a compelling need for information may override the privacy interest."

*McMaster*, 509 N.W.2d at 759 (quoting *Chidester*, 353 N.W.2d at 853).

We believe the present case presents a bona fide claim of compelling interest sufficient to require a limited disclosure of the privileged information, based on the unique facts presented. In contrast to cases such as *Jaffee*, which rejected disclosure, this is a criminal case—one in fact that carries the most severe penalty provided by our law. The subject of the

privilege is deceased and at least some of the information is presently in the public domain in the civil suit. Most importantly, the information sought might reasonably bear on the defendant's possibility of success in supporting his claim of self-defense. Specifically, he might be able to use this evidence, if it shows an explosive disposition on Lyon's part, to cross-examine Lyon's widow, who stated that Lyon sought medical treatment only for depression.

We conclude that a limited disclosure of the medical records should be ordered in this case. In doing so, the medical privilege is neither abridged nor waived. We provide only for an *in camera* examination of the records, as the trial judge previously provided, except that the records shall be made available to defense and prosecution counsel, to aid in the weighing process, under a protective order prohibiting any further dissemination without court order. The records, after copies are provided to counsel, shall be retained by the clerk as confidential records.

**XI.** *Conclusion.*

We hold it was error to submit felony murder based on willful injury and to refuse defense counsel access to Lyon's psychotherapy records. We need not discuss Heemstra's new-trial issues or ineffective-assistance-of-counsel claims because we assume these issues will not arise on retrial. We reverse and remand for a new trial.

**REVERSED AND REMANDED.**

All justices concur except Carter and Cady, JJ., who dissent.

**CARTER, Justice (dissenting).**

I dissent. In deciding the case as it does, the majority of the court disregards the plain meaning of the controlling statutes in order to obtain a result that is more pleasing to its own sense of justice than the interpretation of the statute that is plainly evinced by the wording of the legislation and the legislative history.

## I. *Felony Murder.*

The rule of statutory interpretation that is embodied in our rules of appellate procedure insists that in determining the meaning of statutes "the court searches for the legislative intent as shown by what the legislature said, rather than what it should or might have said." Iowa R. App. P. 6.14(6)(*m*). What the legislature has said in our felony-murder statute and the other statutes bearing on that subject is not subject to dispute. The basic felony-murder statute reads:

> A person commits murder in the first degree when the person commits murder under any of the following circumstances:
>
> . . . .
>
> 2. The person kills another person while participating in a forcible felony.

Iowa Code § 707.2(2) (2001). A forcible felony is defined in our criminal code as "any felonious child endangerment, *assault,* murder, sexual abuse, kidnapping, robbery, arson in the first degree, or burglary in the first degree." *Id.* § 702.11 (emphasis added).[2]

---

[2]Certain felonies that would otherwise fall within the foregoing definition are excepted, including the class "D" felony version of willful injury. *See* Iowa Code § 702.11(2)(*a*). This is not significant in the present case, however, because the felony-murder claim submitted to the jury was predicated on the contention that Heemstra committed murder while participating in the class "C" felony version of willful injury, which was the same offense on which a felony-murder conviction was predicated in *State v. Beeman,* 315 N.W.2d 770, 776-77 (Iowa 1982).

If we interpret this statute according to its plain meaning, it is obvious that the adjective "felonious" modifies all of the offenses thereafter identified, including, among the others, the word "assault." A standard legal dictionary defines "felonious assault" as "[a]n assault that is of sufficient severity to be classified and punished as a felony." *Black's Law Dictionary* 110 (7th ed. 1999). The class "C" felony version of willful injury was, at the time of Lyon's killing, a felonious assault because it was classified by law as a felony, *see* Iowa Code § 708.4(1), and the elements of the crime, i.e., an act intended to cause injury, satisfied the definition of assault embodied in Iowa Code section 708.1(1). The jury could certainly have found from the evidence that in killing Lyon defendant performed an act with the intent to cause him serious injury. In order to trigger the felony-murder doctrine, it was not necessary for the State to show that intent was realized. Iowa Code § 702.13 (A person is participating in a public offense during the entire period commencing with the first act done directly toward the commission of the offense and is participating whether the person is successful or unsuccessful in committing the offense.).

The willful-injury offense upon which felony murder was predicated in *State v. Beeman*, 315 N.W.2d 770 (Iowa 1982), was identical with the present class "C" felony version of that crime. Because that crime fell within the statutory definition of forcible felony and because a person commits murder in the first degree when he or she kills another person while participating in a forcible felony, this court held in *Beeman* that willful injury could serve as a basis for a felony-murder conviction under Iowa Code section 707.2(2). *Beeman*, 315 N.W.2d at 777.

In upholding a felony-murder conviction based on willful injury, *Beeman* did not ignore the merger argument that the majority now opts to adopt. That case discussed the court's earlier consideration of that doctrine

in *State v. Hinkle*, 229 N.W.2d 744, 750-51 (Iowa 1975). *Beeman*, 315 N.W.2d at 777. Although in *Hinkle* this court held that the merger argument had not been preserved for consideration, it discussed the doctrine, as considered by other courts, and stated:

> Other jurisdictions confronted with a properly-presented "felony merger" issue have demonstrated a reluctance to allow the State to bootstrap a higher degree of murder solely on the basis of a felonious assault . . . . Among courts considering the doctrine it has gained widespread acceptance.

*Hinkle*, 229 N.W.2d at 750 (citation omitted).

After considering the merger doctrine as approved in other jurisdictions, the court stated in *Beeman*:

> We conclude that the inclusion, by the legislature, of "felonious assault" in sections 707.2(2) and 702.11, indicates that it intended that felonious assaults, including willful injury under section 708.4, be felonies that may serve as the basis of a felony-murder and that the merger doctrine discussed in *Hinkle* not apply to such assaults.

315 N.W.2d at 777. This result was compelled by the unambiguous wording of the controlling statutes and the long-standing judicial recognition that the legislature is aware of the meaning of all related statutory provisions and does not enact inconsistent provisions without expressly recognizing the inconsistency. *State v. McSorley*, 549 N.W.2d 807, 809 (Iowa 1996). In the present situation, the legislature is presumed to have knowledge of those offenses constituting forcible felonies when it used the unqualified term "forcible felony" in the enactment of the felony-murder provision. The idea that in including willful injury among those offenses giving rise to felony murder the legislature had in mind a compartmentalization of assaultive conduct with the conclusion of an earlier assault prior to the act that does the victim in is absurd. The felony-murder doctrine does not depend on the completion of any forcible felony,

but only the initiation of an act done directly toward the commission of the offense.  Iowa Code § 702.13.

Not only is the result obtained in *Beeman* compelled by the plain language of the controlling statutes, it is also supported by the fact that, in adopting a felony-murder component for all forcible felonies, the legislature rejected a proposal of the Criminal Code Review Study Committee, which it had appointed, providing that homicide and assaults would not be a basis for felony murder.  *See* John J. Yeager, *Crimes Against the Person: Homicide, Assault, Sexual Abuse and Kidnapping in the Proposed Iowa Criminal Code*, 60 Iowa L. Rev. 503, 510-11 (1975) [hereinafter Yeager].  The Criminal Code Review Study Committee employed Professor John J. Yeager of Drake Law School and Professor Ronald Carlson of the University of Iowa College of Law as its drafting consultants.  *See* Mark E. Schantz, *Objectives of Criminal Code Revision:  Guidelines to Evaluation*, 60 Iowa L. Rev. 430, 432 (1975) (discussing background of 1976 criminal code review).  The Criminal Code Review Study Committee submitted a proposed comprehensive revision of the criminal code to the 1974 legislative session.  *Id.*  This was introduced as S.F. 1150.  While this was pending, Professor Yeager, in the article previously cited, discussed the approach of the proposed code revision in regard to felony murder:

> The present first degree murder statute [pre-1978 law] refers to only five of the dangerous felonies.  If a homicide occurs in the course of the commission of some felony other than the five listed, under present law a first degree murder conviction will depend upon a showing of "premeditation and deliberation."  The Proposed Code classifies as first degree homicide any killing which results when one engaged in a felony of *any* nature (*other than homicide or assault*) intentionally resorts to personal violence.

Yeager, 60 Iowa L. Rev. at 510-11 (emphasis added) (footnotes omitted). The section of S.F. 1150 to which the Yeager article refers was chapter 1, section 703, which read as follows:

> A person commits homicide in the first degree when he commits criminal homicide under the following circumstances:
>
> 1. He intentionally commits a homicide, provided that none of the mitigating circumstances as stated in sections seven hundred four (704) and seven hundred five (705) of this division exist.
>
> 2. While participating in a felony *other than homicide or assault,* or while escaping or attempting to escape from lawful custody, he directs violence toward any person which causes the death of such person or another person.
>
> 3. He participates in a forcible felony *other than homicide or assault* and thereby causes the death of some person.

(Emphasis added.)

Contrary to the recommendation of the Criminal Code Review Study Committee, the felony-murder rule adopted by the legislature included all forcible felonies, including felonious assaults. *See* 1976 Iowa Acts ch. 1245, §§ 211, 702.2. This was a clear rejection of the view that felonious assaults may not provide a basis for applying the felony-murder doctrine. We have recognized that, when a statute is passed leaving out qualifying words that had been contained in proposed legislation, the statute should not be interpreted in a manner that would invoke the omitted qualification. *Builders Land Co. v. Martens,* 255 Iowa 231, 236, 122 N.W.2d 189, 191-92 (1963).

Although the reasoning of those courts and commentators that reject the use of felonious assaults as crimes for which felony murder may be established is based on sound policy considerations, those considerations have been rejected by our legislature. As a result, this court is not free to invoke those considerations no matter how valid we find them to be. As the majority has noted, this court has stood strong on this issue in the years

following *Beeman*, and we have reaffirmed that decision on no less than four occasions. This chain of authority presents yet another reason why the result reached in *Beeman* should not now be altered. We have recognized that stare decisis is particularly applicable "where the construction placed on a statute by previous decisions has been long acquiesced in by the legislature, by its continued use or failure to change the language of the statute so construed, the power to change the law as interpreted being regarded, in such circumstances, as one to be exercised solely by the legislature." *Cover v. Craemer*, 258 Iowa 29, 34-35, 137 N.W.2d 595, 599 (1965) (quoting 21 C.J.S. *Courts* § 214 (1959) (currently contained in 21 C.J.S. *Courts* § 167 (1990))). That principle of law has been previously invoked by this court in our consideration of the *Beeman* line of cases. *See State v. Rhomberg*, 516 N.W.2d 803, 805 (Iowa 1994) ("A proposed change in the law, if desired, is in the province of the legislature.").

The majority attempts to justify its clear disregard of the legislature's approach to felony murder by suggesting that applying the interpretation approved in *Beeman* tests the outer constitutional parameters of the felony-murder doctrine. There is no basis for such a suggestion. The acceptance of willful injury as a basis for felony murder was challenged on both due-process and equal-protection grounds in *State v. Ragland*, 420 N.W.2d 791 (Iowa 1988). In rejecting the due-process challenge, we observed that our felony-murder statute did not relieve the state of the burden to prove all of the elements of the basic crime of murder. It only affected the degree of guilt based on the culpability of those acts that constitute the crime of willful injury. *Ragland*, 420 N.W.2d at 794. Those acts require, with regard to the class "C" felony, that the defendant intends to cause serious injury to the victim. Serious injury includes bodily injury that creates a substantial risk of death. *See* Iowa Code § 702.18(1)(*b*)(1).

In rejecting the equal-protection challenge lodged in *Ragland*, we found that there was a rational basis for concluding that the crime of willful injury posed a greater risk to the victim than other crimes for which felony murder may not be invoked. *Ragland*, 420 N.W.2d at 794. A similar rejection of these constitutional arguments was made by the United States Court of Appeals in a federal habeas corpus case in which that court concluded

> "[defendant's constitutional] argument that "second degree murder . . . cannot be enhanced by 'participating' in an act which is also an element of murder," simply lacks a constitutional basis. [The] argument is, at base, an argument against the merger doctrine, which some states apply to prevent felonies that are an integral part of homicide, such as assault, from being used to support a felony murder charge. The Supreme Court of Iowa has specifically rejected the merger doctrine as it applies to forcible felonies . . . .

*Heaton v. Nix*, 924 F.2d 130, 134 (8th Cir. 1991) (citations omitted).

The cases from other jurisdictions on which the majority relies are inapposite because in none of those cases did the court reject as a basis for felony murder a crime embedded by definition in the controlling statutory law. The California and Oregon statutes involved in *People v. Ireland*, 450 P.2d 580 (Cal. 1969), *People v. Washington*, 402 P.2d 130 (Cal. 1965), and *State v. Branch*, 415 P.2d 766 (Or. 1966), were not degree-of-guilt statutes, but rather employed felony murder as an alternative to killing with malice aforethought.[3] A separate-degree-of-guilt statute in those states contained

---

[3]The California statutory scheme for felony murder is described as follows by that state's highest court:

> The felony-murder rule operates (1) to posit the existence of malice aforethought in homicides which are the direct causal result of the perpetration or attempted perpetration of all felonies inherently dangerous to human life, and (2) to posit the existence of malice aforethought and to classify the offense as murder of the first degree in homicides which are the direct causal result of those six felonies specifically enumerated . . . .

a felony-murder theory for establishing first-degree murder, but those statutes did not include felonious assaults among the felonies from which first-degree murder might be determined.[4]

In Massachusetts, where the *Kilburn* and *Gunter* cases discussed by the majority were decided, felony murder is a common-law doctrine not governed by statute. *See Commw. v. Claudio*, 634 N.E.2d 902, 906 (Mass. 1994) ("The felony-murder rule in Massachusetts 'is defined by common law.'" (Citations omitted.)). For this reason, the Massachusetts appellate court was free to adopt a felony-murder rule of its own choosing. Because the felony-murder doctrine in Iowa is statutory and the predicate offenses are determined by statutory designation, this court does not enjoy that freedom.

## II. *Alleged Inadequacy of the Willful-Injury Instruction.*

Defendant contends and the majority suggests that the elements of the willful-injury instruction are inadequate because they only refer to intentionally pointing a firearm or displaying a dangerous weapon in a threatening manner, actions that do not constitute the class "C" felony version of willful injury. This is not a valid contention.

The court's instructions must be considered as a whole in determining whether the correct rules of law were imparted to the jury.

---

*People v. Ireland*, 450 P.2d 580, 589 (Cal. 1969). The Oregon felony-murder scheme has been described as follows by that state's highest court:

> The purpose of the felony-murder rule is to relieve the state of the burden of proving premeditation or malice whenever the victim's death is caused by the killer while the killer is committing another felony. Since a malignant purpose is established by proof of the defendant's other felony, malice is redundant with reference to the killing. If the collateral felony is one of those named in [designated statute] the murder is first degree. If the collateral felony is any other felony, the murder is second degree.

*State v. Branch*, 415 P.2d 766, 767 (Or. 1966).

[4]*See* footnote 2.

*Gremmel v. Junnie's Lounge*, 397 N.W.2d 717, 722 (Iowa 1986). The court's instruction on willful injury not only required the jury to find the pointing of a gun or the displaying of a dangerous weapon in a threatening manner but also to find that in so doing defendant intended to cause a serious injury to Lyon and did in fact cause a serious injury to him. This instruction alone includes all of the basic elements of the class "C" felony version of willful injury, but the instructions as a whole go further. The willful-injury instruction is employed as an expansion on the marshaling instruction for first-degree murder. The matters required to be proved by that instruction must be considered in connection with the willful-injury instruction in determining what the jury was required to find. The first-degree murder marshaling instruction required the jury to find that "the defendant shot Tommy Ray Lyon," "Tommy Ray Lyon died as a result of being shot," and "the defendant acted with malice aforethought." In combination, the instructions state all of the necessary elements for a finding of first-degree murder using willful injury as the predicate felony on a felony-murder theory.

### III. *The Medical Privilege Issue.*

In considering the court's conclusion requiring *in camera* examination of privileged medical records, I do not face the same issue as the majority. The majority opinion has determined that the case should be reversed on the felony-murder issues and thus does not need to find prejudice in order to invoke its view on the availability of the privileged medical records for purposes of a retrial. I, on the other hand, find no other basis for reversing defendant's conviction and will not vote to reverse on the medical-privilege issue unless I am able to conclude that demonstrable prejudice to defendant occurred from the trial court's ruling upholding the privilege. Approaching the issue in this manner, I am satisfied that sufficient

prejudice has not been demonstrated to warrant a reversal of defendant's conviction. Defendant was able to present substantial evidence to the jury concerning Lyon's violent temper directed at both defendant and third parties on prior occasions. The issue that the jury was required to decide was Lyon's conduct immediately prior to the time of his killing. Neither past conduct nor medical history gives rise to more than an educated guess as to that circumstance. Consequently, I do not find that the absence of the medical evidence warrants a reversal. I would affirm defendant's conviction in all respects.

Cady, J., joins this dissent.

#18/04-0058, *State v. Heemstra*

**CADY, Justice (dissenting).**

I respectfully dissent for the same reasons articulated by Justice Carter. I write to elaborate on those reasons.

The majority first concludes that the act constituting willful injury may not also serve as the predicate felony under the felony-murder rule. This holding is not only contrary to established precedents of this court, but it is contrary to the manner our legislature has chosen for the felony-murder rule to operate in Iowa. Under fundamental principles of judicial decision making we are obligated to follow our precedents absent compelling reasons. See Channon v. United Parcel Serv., Inc., 629 N.W.2d 835, 857 (Iowa 2001) ("[U]nder the doctrine of stare decisis there is a preference for upholding prior decisions of this court."); Miller v. Westfield Ins. Co., 606 N.W.2d 301, 306 (Iowa 2000) (noting holdings should be overruled only "when error is manifest"). There are no compelling reasons in this case to overrule our prior holdings, especially since these holdings are based on the judgment of our legislature as reflected in our statutes. Under our limited role in government, it is not for us to chart a different course from the legislature absent a conflict with our constitution. There is no such conflict in this case.

I also believe the opinion by the majority has inflicted harm to the longstanding protections and sound policies of the physician-patient privilege. Regrettably, the damage to this centuries-old doctrine comes from a factual claim by Heemstra that could best be described as a red herring. It is important to understand that Heemstra knew of Lyon's propensity towards violence, or his quick temper, and has no compelling need to examine medical records, which until today, were safely protected under the physician-patient privilege.

Perhaps facts of a case could be envisioned that would support the exception carved from this historic doctrine by the majority, but this case does not come close to presenting those facts. Courts have an obligation to carry forward our bedrock principles of law, such as the physician-patient privilege, so as to provide the same protections for society as in the past. The physician-patient privilege has now been seriously compromised based upon a dubious justification that will mean victims of crimes in the future will be required to open their private, confidential communications with their doctors based upon the same assertions of self-defense. This is an unnecessary invasion of privacy, and could ultimately have a chilling effect on the willingness of patients to openly disclose critical personal information to a physician.

I acknowledge the rights of criminal defendants to a fair trial can, and should, carry significant weight in the balancing process with the rights of others. The rights of a criminal defendant, however, should not tip the scale when prejudice to the defendant will not result. Heemstra did not suffer any prejudice at the hands of the physician-patient privilege in this case, and there is no reason to create an exception to a rule that has served society so well for so long. No arm of government should be entitled to invade private, sensitive communications between citizens made by them under the belief that the communications would remain private, absent the most compelling reasons. There are no compelling reasons in this case, and courts should be quick to protect and preserve the legitimate privacy of individuals from intrusion, not open the door.

I would affirm the district court decision.